# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DR. QINGSHENG ZHU and DR. JULIO SPINELLI, acting jointly as the Stockholder Representative Committee for Action Medical, Inc., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 14-542-SLR |
| BOSTON SCIENTIFIC CORPORATION and CARDIAC PACEMAKERS, INC., | ) ) ) | |
| Defendants. | ) ) | |

## EXPERT REPORT OF PHILIP J. PHILLIPS

### AUGUST 3, 2015

## **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................. 1

II.     EDUCATIONAL BACKGROUND AND QUALIFICATIONS....................................... 2

III.     SUMMARY OF OPINIONS ................................................................ 4

IV.     OPINIONS AND BASES................................................................. 5

      A.     Navigating the PMA process is complicated, time-consuming, expensive and is associated with a risk of failure ................................................ 5

      B.     It is almost certain that FDA approval of a Boston Scientific Corporation device integrated with Action Medical Technology would require an original PMA supported by significant clinical data. ............................................. 14

      C.     FDA would require substantial clinical evidence before approving a BSC device based on the Action Medical Technology. ................................................. 16

      D.     Even with extensive clinical data, there is no assurance that the Action Medical Technology would ever receive FDA approval to be commercially distributed in the U.S. ....................................................... 18

      E.     The expert report of Plaintiffs' witness Joel J. Schwoebel, dated June 15, 2015, includes numerous factually inaccurate representations that suggest a lack of understanding of many aspects of FDA's premarket approval process.......................................................................... 19

# I.    INTRODUCTION

1.      I have been retained on behalf of Boston Scientific Corporation and Cardiac Pacemakers, Inc. (together, "BSC") to provide my expert opinion on matters related to their litigation with Dr. Qingsheng Zhu and Dr. Julio Spinelli, acting jointly as the Stockholder Representative Committee for Action Medical, Inc. (collectively, "Plaintiffs").

2.      I submit this report in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.  This report sets forth the substance of the facts and opinions on which I currently expect to testify and summarizes the bases for my opinions.

3.      The bases for the opinions expressed in this report include: (1) my education and (2) 34 years of experience in medical device regulation, particularly the experience gained as an employee at the United States Food and Drug Administration ("FDA" or Agency"), including but not limited to my roles as Deputy Director of Science and Regulatory Policy and Director of Program Operations, as well as a review scientist, all within the Office of Device Evaluation ("ODE") at FDA's Center for Devices and Radiological Health ("CDRH"); and (3) my review of documents related to this litigation.

4.      Within this report, I have identified relevant sources for the information on which I have relied where appropriate.  These references are not intended to be exhaustive or exclusive. A list of materials considered is attached to this report at **Exhibit A**.

5.      I may rely on figures or enlargements of portions of any of the documents or materials cited in this report as demonstrative exhibits during my testimony at trial.  I may also use a variety of other materials to summarize and support my opinions and testimony.  These may include pacemakers, pacemaker leads, and/or other Cardiac Resynchronization Therapy ("CRT") equipment, models, studies, photographs, videos, animations, charts, drawings, textbooks, articles, patents, and/or other demonstrative materials.

## II.    EDUCATIONAL BACKGROUND AND QUALIFICATIONS

6.      I am currently employed as the President of Phillips Consulting Group, LLC in McHenry, Maryland, where I provide strategic and regulatory consulting services to clients and their counsel on public health related issues, with a focus on managing issues related to the regulation of medical devices and combination products regulated by FDA.  I have over 34 years of experience in FDA regulation of medical devices, with a focus on the development and implementation of regulatory strategies to achieve compliance with FDA requirements regarding the design, manufacture and distribution of medical devices and combination products.

7.      I earned a Bachelor of Science degree from the University of Maryland in 1976, and a Master of Business Administration from the George Washington University School of Government and Business Administration in 1982.

8.      I was employed by FDA in various capacities from 1981 through 2005.  From 1981 through 1984, I served as an Interdisciplinary Scientist in the Division of Ophthalmic Devices ("DOD") in ODE.  From 1984 through 1987, I served as the Branch Chief of the Surgical and Diagnostic Devices Branch in DOD and as the Deputy Director of DOD from 1986 through 1987.

9.      From 1987 through 1994, I served as the Director of Program Operations in ODE where I had responsibility for running the Premarket Approval Application ("PMA") program.  I also served as the Interim Director of ODE's Division of General and Restorative Devices in 1993.

10.     From 1994 through 2005, I served as the Deputy Director of Science and Regulatory Policy in ODE.  As Deputy Director of Science and Regulatory Policy, I played a leadership role in the organizational unit in FDA that is responsible for the premarket evaluation and market authorization of all medical devices intended for commercial distribution in the US.

- 2 -

As ODE's chief scientific and regulatory policy maker, I planned, managed, and directed all

premarket review programs that ensure the safety and effectiveness of medical devices marketed

and used in the U.S.  My role as a Deputy Director in ODE required me to manage and direct six

review divisions that encompassed all medical specialties, three support staffs, and a total work

force of over 300 scientists, engineers, and clinicians.

11.    I have been a consultant in FDA-related matters since 2005.

12.    I am being compensated at a rate of $500 per hour for time spent on this matter.

My compensation is not related in any way to the outcome of this litigation.

13.    In the last four years, I have been deposed or provided testimony as an expert in

the following matters:

- 2014-Koninklijke Philips N.V. and Philips Electronics North America
  Corporation v. Zoll Medical Corporation Case No. 1:10-cv-11041-
  NMG [Deposition, Newport Beach, California, December 2, 2014]

- 2013-Center City Periodontists, P.C., et al v. Dentsply
  International, Inc. Case No. 2:10-cv-00774-CDJ (US District Court for
  the Eastern District of PA) [Deposition, Baltimore, Maryland, October
  9, 2013]

- 2013-Marvin C. Weinstadt, D.M.D., et al v. Dentsply International, Inc.
  Case No. CSG-04-432370 (Superior Court of the State of California)
  [Trial, San Francisco, California, September 18, 2013]

- 2013-Marvin C. Weinstadt, D.M.D., et al v. Dentsply International, Inc.
  Case No. CSG-04-432370 (Superior Court of the State of California)
  [Deposition, Baltimore, Maryland, July 30, 2013]

- 2013-Fred E. Taylor v. Scott Bildsten, D.O., et al Case no. 09-2-
  03136-5 (Superior Court for the State of Washington) [Trial, Port
  Orchard, Washington, May 8, 2013]

- 2012-Fred E. Taylor v. Scott Bildsten, D.O., et al Case no. 09-2-03136-
  5 (Superior Court for the State of Washington) [Deposition, Washington,
  D.C., December 19, 2012]

- 2012-Tamra M. Trujillo v. Breg, Inc. Case no. 30-2010-004355594-CU-
  MT-CXC (State of California) [Deposition, Washington, D.C., July 10,

2012]2012 Jannelle Elizabeth Barnes v. Breg, Inc. Case no. 1100402-JCC (U.S.D.C Western District of Washington at Seattle) [Trial, Seattle, WA, June 26 and 27, 2012]

- 2012 Hossein Baharestani v. Zoll Circulation, Inc. Case no. 110-CV-177164 (Superior Court for the State of California) [Deposition, Boston, MA, April 17, 2012]

- 2011 Eric Hackett v. Breg, Inc. Case no. 10-CV-01437 REB-KMT (U.S.D.C. for the District of Colorado) [Trial, Denver, CO November 15, 2011]

- 2011 Lynne K. Staub v. Breg, Inc. Case no. 2:10-cv-02038-FJM (U.S.D.C. for the District of Arizona) [Deposition, Washington, D.C., October 20, 2011]

- 2011 Stuart A. Davis v. Breg, Inc. Case no. CV-09-144-BLG-RFC (U.S.D.C. District of Montana) [Trial, Billings, MT August 15, 2011]

14.     My current *curriculum vitae*, which provides additional detail on my qualifications and background, is attached to this Report as **Exhibit B**.

## III.     SUMMARY OF OPINIONS

15.     I expect to provide testimony to assist the jury in understanding (1) the issues in this case regarding FDA regulation of medical devices in the U.S. and, more specifically, the regulation of new medical devices used in the cardiac rhythm management ("CRM") field of medicine, as well as (2) the opinions that I have expressed in this report.

16.     I have formed, and expect to provide testimony regarding, the following opinions:

a.     Navigating the PMA process is complicated, time-consuming, expensive and associated with a risk of failure.

b.     It is almost certain that FDA approval of a Boston Scientific Corporation ("BSC") device integrated with Action Medical Technology would require an original PMA supported by significant clinical data.

c.     FDA would require substantial clinical evidence before approving a BSC device based on the Action Medical Technology.

- 4 -

       d.      Even with extensive clinical data, there is no assurance that the Action Medical Technology would ever receive FDA approval to be commercially distributed in the U.S.

       e.      The expert report of Plaintiffs' witness Joel J. Schwoebel, dated June 15, 2015, includes numerous factually inaccurate representations that suggest a lack of understanding of many aspects of FDA's premarket approval process.

17.     The bases for my opinions are set forth below.  I expect to provide testimony at trial regarding each of my opinions and their bases.  I reserve the right to supplement this Report and the opinions set forth herein to address any arguments that Plaintiffs or its expert(s) raise, and/or any additional information that comes to my attention as this litigation proceeds. Additionally, I may respond to or comment on the testimony of other fact or expert witnesses, including witnesses that appear on behalf of the Plaintiffs.

## IV.    OPINIONS AND BASES

### A.    Navigating the PMA process is complicated, time-consuming, expensive and is associated with a risk of failure

18.     The objective of FDA device regulation is to provide the American public with reasonable assurance of the safety and effectiveness of all medical devices.  21 U.S.C. § 393(b). To achieve reasonable assurance of safety and effectiveness, the FDA has created a classification system in which a particular device's class designation dictates the applicable regulatory requirements.  In other words, the FDA's approach to assuring the safety and effectiveness of a given device depends upon the device's classification and varies with the level of concern that FDA has regarding the adequacy of existing controls to provide meaningful assurance of the device's safety and effectiveness.  The classification system is defined by the Act.

19.     The Act defines three classes of medical devices:  class I, class II, and class III. Class I devices are simple products that usually present minimal potential for harm to the user. 21 U.S.C. § 360c(a)(1)(A).  These devices are subject to "general controls," a set of controls

applicable to virtually all devices, and which involve the least amount of regulation by FDA. General controls include labeling, provisions against adulteration and misbranding, good manufacturing practices ("GMPs"), establishment registration, medical device listing, and premarket notification prior to marketing a device.  *See* 21 U.S.C. § 351, 352, 360, 360f, 360h, 360i, and 360j.

20.     In general, class II devices present a greater level of potential risk than class I devices.  In addition to general controls, class II devices may be subject to additional special controls to assure safety and effectiveness.  21 U.S.C. § 360c(a)(1)(B).  Special controls may include special labeling requirements, mandatory performance standards, postmarket surveillance, patient registries, development and dissemination of guidelines, recommendations, and any other actions that the Secretary of Health and Human Services determines are necessary to assure safety and effectiveness.  Special controls have been established on a case by case basis for select class II devices.

21.     Under the Act, class III devices are those devices purported or represented to support or sustain human life, to be of substantial importance in preventing impairment of human health, or to present a potential unreasonable risk of illness or injury to patients.  21 U.S.C. § 360c(a)(1)(C)(ii).  Class III devices are subject to the highest levels of FDA regulatory controls, including general controls and any relevant special controls, and must undergo a rigorous FDA review process called premarket approval.  21 U.S.C. § 360e.  Premarket approval is the most stringent type of device marketing application required by FDA.  Due to the complexity and the level of risk associated with class III devices, FDA has determined that general and special controls alone are insufficient to assure the safety and effectiveness of class III devices or that special controls cannot be developed.  Therefore, class III devices require the submission and

approval of a PMA under Section 515 of the FDCA in order to obtain premarket approval.  21

U.S.C. § 360e(c).  PMA requirements are analogous to FDA's new drug application ("NDA")

requirements.  21 U.S.C. § 355.

22.     Implantable CRM devices, such as the modified pulse generators and pacemaker

leads that I understand would be necessary to implement the Action Medical Technology; all

constitute class III devices subject to PMA requirements.  CRM devices include: Implantable

Cardioverter Defibrillators ("ICDs"), Cardiac Pacemakers, including Implantable Pacemakers,

Single-Chamber Pacemakers, Dual-Chamber Pacemakers, and Biventricular Pacemakers; and

CRT, including CRT Defibrillators ("CRT-D") and CRT Pacemakers ("CRT-P").

23.     Pursuant to 21 U.S.C. §§ 360c and 360e, premarket approval is the FDA process

of scientific and regulatory review to evaluate the safety and effectiveness of class III medical

devices.  As previously stated, a PMA application is the most complex and difficult medical

device marketing application to prepare.  The PMA process requires a determination by FDA,

based on valid scientific evidence developed and presented in the application, that there is a

reasonable assurance of the safety and effectiveness of the device for its intended uses and

conditions of use.

24.     Regulations governing the PMA process are described in 21 CFR § 814 –

Premarket Approval Procedures.  In accordance with 21 U.S.C. § 360c, 21 CFR § 814.20 lists

the required contents of a PMA, which include (amongst other things):  administrative

requirements; a summary of safety and effectiveness; device labeling; a complete device

description; adherence to relevant performance standards; technical sections, including specific

information from nonclinical laboratory studies in animals and from clinical testing in humans; a

bibliography of all known published reports concerning safety or effectiveness; and information

on the manufacturing process and documented evidence of its compliance with the Quality

Systems Regulation ("QSR").

25.     Among other relevant factors that were previously identified, FDA considers the

following in determining safety and effectiveness in regard to PMA decisions:  the intended

patient population; conditions of use in labeling or advertising; the probable benefit to health

from the use of the device, weighed against its risks, and the reliability of the device.  21 CFR §

860.7(b).

26.     Based upon valid scientific evidence, as defined by 21 CFR § 860.7, reasonable

assurance of device safety is established when it is determined that the probable benefits to

health from use of the device for its intended use outweigh any probable risks, and there is

adequate demonstration of the absence of unreasonable risk of illness or injury associated with

the use of the device for its intended use. 21 CFR § 860.7(d)(1).  Reasonable assurance of

effectiveness is established when it is determined that in a significant portion of the target

population, the use of the device for its intended use and conditions of use will provide clinically

significant results. 21 CFR § 860.7(e)(1).

27.     FDA approval of a PMA is always based on clinical performance data and

manufacturing information. *See, e.g.,* 21 U.S.C. § 360e(c)(1).  In the majority of cases,

manufacturers must conduct clinical studies sufficient to assess the safety and effectiveness of

the subject device.  Clinical trials that are conducted in the U.S. must be conducted in accordance

with FDA's Investigational Device Exemption ("IDE") regulations.  The IDE regulation provides

procedures for the conduct of clinical investigations of devices that cannot otherwise be

commercially distributed in the U.S., including devices that have not yet received market

authorization.  21 CFR § 812.  In general, a device that otherwise would be required to be the

- 8 -

subject of an approved PMA, may be lawfully shipped in interstate commerce for the purpose of gathering safety and effectiveness information, as long as the device conforms with the IDE requirements. 21 U.S.C. § 360j(g)

28.     An approved IDE exempts a device from the requirements of the following sections of the FDCA and regulations issued thereunder: Misbranding under Section 502 (21 U.S.C. § 352); registration, listing, and pre-market notification under Section 510 (21 U.S.C. § 360); performance standards under § 514 (21 U.S.C. § 360d); pre-market approval under Section 515 (21 U.S.C. § 360e); a banned device regulation under Section 516 (21 U.S.C. § 3600; records and reports under Section 519 (21 U.S.C. § 360i); restricted device requirements under Section 520(e) (21 U.S.C. § 360j(e)); good manufacturing practice requirements under Section 520(f) (21 U.S.C. § 360j). except for the requirements found in 21 CFR § 820.30, if applicable (unless the sponsor states an intention to comply with these requirements under 21 CFR §§ 812.20(b)(3) or 812.140(b)(4)(v); and color additive requirements under Section 721 (21 U.S.C. § 379e).

29.     In the case of a class III device, data collected in the clinical studies is submitted to FDA for review in support of PMA approval. *See, e.g.,* 21 U.S.C. § 360e(c)(1)(A). On certain PMAs, a FDA advisory panel makes a report and recommendation for approval or disapproval to the Agency. The FDA Commissioner, or those FDA employees formally delegated decision-making authority, make the decisions regarding which devices may be marketed in the U.S. *See, e.g.,* 21 U.S.C. § 360e(d).  Premarket approval is based on a determination by FDA that the PMA contains sufficient, valid scientific evidence to provide a reasonable assurance of the device's safety and effectiveness for its intended use(s) and conditions of use. *See id.*  An approved PMA is, in effect, a private license granting the applicant permission to market the device.

30. Only after FDA determines that the applicant has provided reasonable assurance of safety and effectiveness of the device subject to PMA requirements, and approves the PMA pursuant to FDA's issuance of formal order, may the class III device then be marketed for human use in the U.S. 21 U.S.C. § 360e(a). PMA approval constitutes "FDA approval" of the PMA application, the device and the device's labeling. If the Agency concludes that the evidence provided in the PMA does not demonstrate safety and effectiveness, the PMA will not be approved.

31. Generating valid scientific evidence, as defined by 21 CFR § 860.7, requires the conduct of well-designed and carefully monitored clinical trials that are based on nonclinical bench and animal studies which all-in-all can be complex and extremely time-consuming to conduct, as well as very expensive.

32. Any modification to class III devices is also subject to PMA requirements. For a modification to a PMA approved device that affects the device's safety and effectiveness a supplemental Premarket Approval Application or "PMA Supplement" is required, unless the regulations allow for an alternate submission type, e.g., a 30-Day Notice for certain manufacturing changes. While a PMA Supplement may be required, not all modifications to PMA approved devices are eligible for review as a PMA Supplement. In general, the more technologically complex the modification is, or the greater potential impact that the modification may have on clinical performance, as evidenced by the number of scientific/medical disciplines that are required to assess the effect of the modifications on safety and effectiveness, the more likely that FDA will determine that it is appropriate to review the modified device in an original PMA and not as a PMA Supplement, While the difference between an original PMA and PMA Supplement may seem significant, from a legal/regulatory perspective, there is no difference

between the two.  Both require reasonable assurance of safety and effectiveness for approval.

The only difference between the two is that a PMA Supplement automatically incorporates any

relevant information that exists in the original PMA, or previously approved PMA Supplements,

and does not require resubmission and re-review of the data and information by FDA.

33.     A modification to an approved device that changes the Indications for Use, results

in a different mechanism of action (*i.e.*, the means by which it achieves its clinical effect), or

otherwise affects how the device fulfills its intended use, usually requires the conduct of a

clinical trial.  PMA Supplements that include clinical data are referred to as Panel-Track

Supplements.  When such a modification is accompanied by changes in materials, design and/or

manufacture, it is likely that FDA will not accept and process a Panel-Track Supplement, but

rather require the submission of an original PMA.

34.     As mentioned before, a PMA is the most complex and difficult U.S. medical

device application to prepare.  It is subject to the content requirements of 21 CFR § 814.20,

which includes among many other things, all information that is adverse or supportive of

approval, information that should be reasonably known to the applicant, and information that can

be reasonably obtained by the applicant.  Complete original and supplemental PMAs are subject

to 180 day review cycles.  Because of the complexity of PMAs, multiple review cycles are often

required for FDA to complete the review and render a final decision.  While past experience does

not allow accurate predictions of the time that it takes to receive PMA approval for new devices

because of the wide variation in circumstances from one PMA application to another, **TABLE 1**

displays the time between FDA receipt of the select PMAs and PMA Panel-Track Supplements

relied upon by Mr. Schwoebel, and the time of FDA approval for each.  The data demonstrates

that time to approval often substantially exceeds 180 days.  It is also important not to lose sight

of the fact that such times do not include the time that is required to properly verify and validate the subject device's design, analyze study results, prepare study reports, and prepare and submit the regulatory submission.  When clinical trials are involved, whether they be feasibility or pivotal studies, IDEs consume significant time and effort which is not reflected in PMA review times.  .

**TABLE 1** – Total Time to FDA Approval for Select PMAs and Panel-Track Supplements

| PMA Applicant/PMA Number | FDA Receipt Date | FDA Approval Date | Elapsed Time – Receipt to Approval (Days) |
|---|---|---|---|
| Boston Scientific Corp./P010012 | 02/27/2001 | 05/02/2002 | 429 |
| Boston Scientific Corp./P010012'S026 | 03/29/2004 | 09/14/2004 | 169 |
| Boston Scientific Corp./P010012/S037 | 11/10/2004 | 03/13/2008 | 1219 |
| Boston Scientific Corp./P010012/S230 | 12/11/2009 | 09/16/2010 | 279 |
| Boston Scientific Corp./P030005* | 03/24/2003 | 01/26/2004 | 308 |
| Biotronik/P950037* | 11/16/1995 | 10/11/1996 | 330 |

*FDA's database shows no Panel-Track PMA Supplements having been approved for this PMA.

35.     A product development protocol ("PDP") is an alternative to submitting a PMA. 21 USC § 360e(f).  Historically, FDA has accepted extremely few PDPs.  Because there is no implementing regulation, as there is for PMAs, and FDA has not encouraged or readily accepted PDP submissions, there is no efficiency to be gained in pursuing this alternative to a PMA for a CRT device.

36.     I disagree with Plaintiffs' interrogatory contentions that BSC would have obtained FDA approval of the Contingent Payment Product "if BSC had spent the $15 million to carry out an appropriate technology development plan" during the four year period set forth in the 2009

- 12 -

Agreement, and that "FDA approval also was readily achievable."[1]  Indeed, this position is directly contradicted by the deposition testimony of one of the two named Plaintiffs.[2]  BSC's own summary of the Action Medical transaction in an internal accounting memorandum dated April 10, 2009 recognized that, "Significant resources will be required to duplicate Action Medical research results and get the product to market. Clinical trials, animal testing through CE mark and FDA approval would be required. ***Estimated future R&D investment would be approximately $100-150M***, depending on which indications would be developed (Brady and/or CRT-D)."[3]

37.     Furthermore, in a 2010 survey of 200 medical device companies, participants indicated an average duration of 54 months (4.5 years) for PMA applications from first communication to approval (or the time of the survey for those that were still in progress), and an average total cost from concept to approval of 98 million for devices subject to PMA requirements (not including costs relating to reimbursement and sales/marketing activities), with 75 million spent on the stages linked to the FDA (*i.e.*, the process of obtaining IDE, safety/feasibility clinical study, pivotal clinical study, and the process of obtaining PMA).[4]  More recently, the Director of CDRH, Jeffrey Schuren, M.D., J.D., reported a median time to full IDE approval of 442 days in 2011, with a reduction to 215 days in 2013.[5]  These reports highlight the magnitude of the investment, from both a time and monetary perspective, that  manufacturers

---

[1] *See, e.g*, Plaintiffs' Objections and Responses to BSC's Second Set of Interrogatories (Nos. 10-14), (Feb. 9, 2015) at Response to Interrogatory No. 13; Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-9), (Feb. 9, 2015) at Response to Interrogatory No. 6.

[2] Depo. Tr. Qingsheng Zhu, Ph.D., p. 214 (Apr. 15, 2015) ("It is not 15 million would reach, necessarily reach the FDA approval. ***It's most likely it would take far more money, okay.***") (emphasis added).

[3] BSC00079700 (emphasis added).

[4] Josh Makower, *FDA Impact on U.S. Medical Technology Innovation: A Survey of Over 200 Medical Technology Companies* (2010) http://eucomed.org/uploads/Press%20Releases/FDA%20impact%20on%20U.S.%20Medical%20Technology%20Innovation.pdf

[5] Presentation at Xavier University.  Strategic Priorities for 2015 and Beyond. 06 May 2015. http://xavierhealth.org/wp-content/uploads/Shuren_FDA-Strategic-Prioritites-for-2015-and-Beyond.pdf

undertake when deciding to engage with the FDA in seeking regulatory approval of a class III medical device.

**B.    It is almost certain that FDA approval of a Boston Scientific Corporation device integrated with Action Medical Technology would require an original PMA supported by significant clinical data.**

38.    According to FDA, "a primary indicator of what type of PMA submission is needed is the nature of the data, if any, that is needed to demonstrate the safety and effectiveness of the modified device."[6]  When an applicant can rely on data previously submitted to the Agency and relied upon for approval, a PMA Supplement may be an appropriate means to reach the market.  When the modified device requires new bench, animal and/or clinical, the previously submitted and reviewed data may have no relevance to the modified device that the person is interested in marketing.  When this is the case, it is almost certain that FDA will require an original PMA.

39.    Mr. Myrum, in his report at ¶48, characterized the Action Medical Technology as "the novel approach to His pacing that Dr. Daniel Ortega, an Argentinean physician, developed that, among other things, created ventricular activation that stimulates both the right and left ventricles with a single lead in the right ventricle using a form of an overlapping and staggered non-overlapping biphasic waveform called 'Xstim.'"  From the FDA perspective, such a profound change in the mechanism of action would require a demonstration of its safety and effectiveness, which can only be achieved through the conduct of a clinical trial.  Furthermore, it is my understanding that the existing BSC devices are incapable of being used to perform the

---

[6] FDA. *Guidance for Industry and FDA Staff :Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process.* 11 Dec. 2008. http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM270606.pdf

procedure without modification.[7]  As BSC's own documents reflect, "the Action Medical technology *cannot simply be 'plugged into' market participant devices* and significant can and lead work in addition to *significant and costly clinical trials would be needed* to bring this technology to market."[8]

40.     Based on my review of the reports of Mr. Stein and Dr. Benditt, as well as Mr. Schwoebel and Mr. Myrum, it appears that the claimed Contingent Payment Product would constitute a significant departure from BSC's FDA-approved CRT-D and CRT-P devices, approved in PMA numbers P010012 and P030005, respectively.   In light of the differences in the core technology, method of treatment, indications for use, conditions of use, patient populations, physiological location, surgical procedure, changes in design, labeling, instructions for use, and manufacturing that would exist between the claimed Contingent Payment Product device and BSC's PMA approved pacemaker leads and ICD pulse generators, it is clear to me that FDA would require that the Contingent Payment Product be submitted as an original PMA.[9]  Any attempt by BSC to obtain approval of the Contingent Payment Product device via a PMA supplement to the P010012 PMA (BSC's implantable defibrillators and corresponding leads) or the P030005 PMA (BSC's bradycardia pacemakers and corresponding leads) would require substantial modification of existing PMA-approved devices to such a degree that FDA would consider it to be a "new device" requiring the submission of an original PMA.

---

[7] *See, e.g.*, Stein Disclosure, pp. 11-12; BSC's Objections and Responses to Plaintiffs' Second Set of Interrogatories (Nos. 5-11) (Apr. 30, 2015) at Response to Interrogatory No. 11.
[8] BSC00079700 (emphasis added).
[9] *See, e.g.*, Stein Disclosure, pp. 11-12; BSC's Objections and Responses to Plaintiffs' Second Set of Interrogatories (Nos. 5-11) (Apr. 30, 2015) at Response to Interrogatory No. 11; BSC00079700; Myrum Report, Appx. C; Schwoebel Report at ¶126 ("In addition, the Contingent Payment Product will be incorporated into cardiac pacemaker technology already commercialized by BSC *by making changes to the existing hardware, electronics and programme*r.") (emphasis added).

- 15 -

**C.     FDA would require substantial clinical evidence before approving a BSC device based on the Action Medical Technology.**

41.     As a class III life-supporting/life-sustaining device, any device manufacturer intending to introduce a new approach to ventricular pacing that stimulates both the right and left ventricles with a single lead placed in the right ventricle should anticipate being required to submit valid scientific evidence in the form of clinical data that demonstrates a reasonable assurance of safety and effectiveness.  The nature of the clinical trial would depend on many factors, including details of the target population and specific performance claims that the applicant would like to be permitted to make after approval.  To get a sense of the data that might be required for approval, it is reasonable to consider what FDA required for approval of similar devices for other therapeutic approaches.  In the case of BSC, the data submitted in support of approval for each original PMA and for each Panel-Track Supplement should be considered (**TABLE 2**).

**TABLE 2** – Summary of Clinical Studies in BSC Original and Panel-Track Supplements

| PMA Number | Subject of the Submission | Nature of the Clinical Data |
|---|---|---|
| P010012 | New device | A prospective randomized, controlled, multicenter, doubleblind study conducted at 47 sites in the US and enrolled a total of 581 patients.  A total of 248 patients had three months of follow-up. An addition 333 patients had six-month follow-up. |
| P010012/S026 | Modified Indications for use and additional claims | A prospective, open-label, randomized, controlled, multicenter, unblinded study conducted at 128 sites and enrolled a total of 1638 patients, of which 1520 were randomized. Of the 1520 patients, 595 were randomized to CRT-D with a mean follow-up of 1.3 years and 308 were randomized to OPT with a mean follow-up of 1.1 years. |
| P010012/S037 | Modified device and modified Indications for Use. | A 170 patient prospective, multi-center, single-arm study at 38 centers in the US. One hundred sixty eight (168) patients underwent a procedure to receive the CONTAK RENEWAL 3 AVT or CONTAK RENEWAL 3 AVT HE device and the EASYTRAK/EASYTRAK 2 pace/sense lead. Patient follow-up through 3 months, with routine evaluation of |

- 16 -

| PMA Number | Subject of the Submission | Nature of the Clinical Data |
|---|---|---|
| | | device function and patient condition thereafter.<br><br>Plus Companion Trial Retrospective Sub-Analysis |
| P010012/S230 | Modification to expand Indications for Use. No device modifications. | A prospective, multi-center, randomized clinical study conducted in the US, Europe, Canada, and Israel. Patients were randomized in a 3:2 ratio to receive either a CRT-D or implantable cardioverter defibrillator (ICD). Supplement was based 1820 patients at 110 investigational sights. Patient follow-up was 34.3 + 12.2 months. |
| P030005 | New Device | A multi-center, prospective, clinical investigation conducted at 67 sites in the US with 448 patients enrolled.  Six-month follow-up with routine evaluation of device function and patient condition thereafter.<br><br>A prospective, multi-center, non-randomized evaluation conducted in Europe, in which 46 patients completed testing. to demonstrate continuous appropriate biventricular (BiV) pacing over a 24 hour period and during exercise using Holter monitor recordings. |

42.     While clinical data collected outside of the U.S. ("OUS") may be acceptable for PMA approval purposes, relying on OUS data, particularly as the sole basis for approval, is risky.  It is not unusual for the Agency to question the applicability of such data to the U.S. population, the competence of foreign investigators, the relevance of the experience to the practice of medicine in the U.S., and whether the data can be properly validated.

43.     Data clinical generated by Dr. Ortega in Argentina is of limited usefulness.  While having a financial interest in a device does not by itself constitute a conflict of interest, it certainly is a potential source of bias.  In this regard, FDA requires disclosure of certain financial interests in regulatory submissions and looks carefully at the purpose of an affected study, as well as the study design as the means to judge the reliability of the study results.  *See, e.g.*, 21 CFR §§ 54.4, 54.5, 814.20(b).

44.    To gather data on the Action Medial Technology sufficient to support PMA approval, an approved IDE application would be necessary. While the specific requirements for FDA approval of an IDE is somewhat speculative, to gain approval of such a trial, BSC would need a specific device design that has progressed to a point where it is sufficiently similar to the design that it intends to market so that there are no questions regarding the applicability of the data to the device that will be described in the future PMA. Furthermore, sufficient non-clinical (e.g., bench and animal testing) would be needed to ensure that human subjects enrolled in the clinical trial would not be subjected to an unreasonable risk.

45.    In my experience, the success of any clinical trial relates primarily to developing an appropriate study design, implementing the study so as to ensure the integrity of the data, and performing a proper analysis of the results. Because of the length of time that transpires between designing a clinical trial and submitting a final study report in a PMA, it is critical that sponsors of clinical trials monitor study progress and take corrective action when necessary to ensure the optimum opportunity for success.

**D.    Even with extensive clinical data, there is no assurance that the Action Medical Technology would ever receive FDA approval to be commercially distributed in the U.S.**

46.    The approvability of all PMAs depends on whether the data and information contained in the submission constitutes valid scientific evidence and whether it demonstrates a reasonable assurance of safety and effectiveness of the subject device for the device's intended use, and under the conditions of use, to FDA's satisfaction.

47.    A person may have confidence in the adequacy of the contents of a PMA, however, no one can predict with certainty whether any PMA submission will be approved by FDA. The sheer volume of information that is required by the PMA process, the breadth of scientific and clinical evidence that is necessary to demonstrate safety and effectiveness, and the

- 18 -

complexity of the subject matter inevitably gives rise to substantive questions or "deficiencies." In my experience, it is a rarity for a PMA, or Panel-Track Supplement to be approved without substantive questions be posed for the applicant.

48.     There is no way to collaborate with FDA to eliminate the possibility that data collected in support of a PMA approval will be determined to be inadequate for approval.  While a number of avenues exist to interact with the Agency for the purpose of ensuring the adequacy of any effort to generate needed data or information for PMA approval, FDA is never completely bound by any agreements that are reached, particularly agreements reached through the Pre-Submission or "Pre-Sub" process.  In fact, even in the case of the two early collaboration meetings established by the FDA Modernization Act of 1997 ("FDAMA") that are "binding" on the Agency, the Agency is not bound when something is judged to be contrary to public health or when there is a substantial scientific issue essential to determining the safety or effectiveness of the device. 21 USC § 360c(a)(3)(D) and 21 USC § 360j(g)(7)

49.     While precedent is important and forms a solid foundation upon which a prediction of approval of a PMA can be based, there is too much variability between device design and manufacture, and performance, as well as approaches to demonstrating safety and effectiveness, to rely on it.  None of the PMA Supplements that Mr. Schwoebel cited to support his contention that BSC would have received PMA approval, if it had submitted a PMA Supplement for the Action Medical Technology, have any relevance to approval of a new device. While the majority of submissions that he cited are not PMA Supplements, those that are did not involve the same issues as the approval of a device based on Action Medical Technology.

**E.      The expert report of Plaintiffs' witness Joel J. Schwoebel, dated June 15, 2015, includes numerous factually inaccurate representations that suggest a lack of understanding of many aspects of FDA's premarket approval process.**

50.     Despite Mr. Schwoebel's assertion at ¶68 of his report that "with regard to 'safety,' the FDA evaluates data provided by Sponsors about two (2) fundamental characteristics of the device," FDA actually considers the following *four* factors pursuant to 21 CFR § 860.7(b) in determining safety and effectiveness for PMA purposes:

(1)     The persons for whose use the device is represented or intended;

(2)     The conditions of use for the device, including conditions of use prescribed, recommended, or suggested in the labeling or advertising of the device, and other intended conditions of use;

(3)     The probable benefit to health from the use of the device weighed against any probable injury or illness from such use; and

(4)     The reliability of the device.

51.     Moreover, contrary to the additional assertions of Mr. Schwoebel in ¶68 of his report, valid scientific evidence does *not* include "field experience of products of similar types that have been previously sold commercially."  In fact, FDA determinations of safety and effectiveness can *only* be made based on "valid scientific evidence" as the term is defined in 21 CFR § 860.7(c)(2).

52.     Furthermore, his reference in that same paragraph to the Manufacturer and User Facility Device Experience ("MAUDE") database as a source of documentation regarding the "absence of unacceptable level(s) of adverse experiences" also fails to recognize that information in the MAUDE database does *not* constitute valid scientific evidence or data.  While it is true that FDA maintains a record of adverse experiences in its MAUDE database, the database is comprised of mandatory and voluntary medical device reports.  In the context of medical device reports or "MDRs," FDA has recognized the limitations of the MAUDE database with the following statement:

Although MDRs are a valuable source of information, this passive surveillance system has limitations, including the potential submission of incomplete,

- 20 -

inaccurate, untimely, unverified, or biased data. In addition, the incidence or prevalence of an event cannot be determined from this reporting system alone due to potential under-reporting of events and lack of information about frequency of device use.[10]

53.     The phrase "intended use" has different meanings depending on the context in which it is used.  For labeling and enforcement purposes, it is defined in 21 CFR § 801.4, which is the definition excerpted in ¶76 of Mr. Schwoebel's report.  However, in the context of device classification, FDA recently issued a definition in an Agency guidance document stating that for purposes of demonstrating substantial equivalence, "the term intended use means the general purpose of the device or its function, and encompasses the indications for use."[11] With regard to the PMA process, the concept of intended use has not been so defined, and actually has little relevance to decision-making.  Rather, in the PMA context, the focus tends to be on the indications for use.[12]

54.     I believe Mr. Schwoebel's definition of "effectiveness" at ¶70 of his report as "an evaluation of 'how well' the product fulfills its intended use and indications for use in the diagnosis and treatment of a medical condition" to be both imprecise and incomplete.  In the context of medical device regulation, it is best to cite the actual definition of "effectiveness," rather than paraphrase and risk creating a misleading impression of what it takes to determine its existence.  Effectiveness is defined in 21 CFR § 860.7(e) as follows:

> (1)     There is reasonable assurance that a device is effective when it can be determined, based upon valid scientific evidence, that in a significant portion of the target population, the use of the device for its intended uses and conditions of use, when accompanied by adequate directions for use and warnings against unsafe use, will provide clinically significant results.

---

[10] http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm
[11] FDA. The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]. 28 July 2014.  http://www.fda.gov/downloads/MedicalDevices/.../UCM284443.pdf
[12] 21 CFR § 814.20(b)(3)(i) (stating that a PMA shall include a sufficiently detailed summary of indications for use which is defined as "[a] general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended.").

(2)   The valid scientific evidence used to determine the effectiveness of a device shall consist principally of well-controlled investigations, as defined in paragraph (f) of this section, unless the Commissioner authorizes reliance upon other valid scientific evidence which the Commissioner has determined is sufficient evidence from which to determine the effectiveness of a device, even in the absence of well-controlled investigations. The Commissioner may make such a determination where the requirement of well-controlled investigations in paragraph (f) of this section is not reasonably applicable to the device.

55.   In order to demonstrate device effectiveness, FDA almost always requires data from well-controlled clinical investigations. I therefore agree with Mr. Schwoebel's recognition in ¶70 of his report that, "clinical effectiveness usually is demonstrated in a well-defined and well-controlled investigational study," that "[u]sually each indication for use, and any additional clinical claims that a medical device sponsor wishes to describe in product labeling, must be supported by clinical data," and that "to provide cardiac resynchronization therapy via CRT-P using para-Hisian stimulation would require a specific 'research study' to show 'effectiveness.'"

56.   Despite Mr. Schwoebel's statement in ¶70 of his report that "Sometimes, published articles will satisfy some of the requirements for clinical data," the fact remains that published literature usually does not constitute an adequate basis for PMA approval. Very few PMAs, including PMA supplements, have been approved by FDA since enactment of the Medical Device Amendments of 1976 to the FDCA based strictly on published literature. FDA rejections of published literature as the basis for premarket approval usually relates to a lack of detail and direct applicability to the subject device. FDA has stated that literature "may be accepted as the sole basis for approval of PMA, PDP, and HDE[13] supplements when the literature is sufficient, detailed, objective, and directly applicable to the subject device."[14]

---

[13] "HDE" is a Humanitarian Device Exemption (21 CFR § 814.3(m)) for a Humanitarian Use Device ("HUD"). As defined in 21 CFR § 814.3(n), a HUD is a "medical device intended to benefit patients in the treatment or diagnosis of a disease or condition that affects or is manifested in fewer than 4,000 individuals in the United States per year."

57.     In contrasting European and U.S. requirements, Mr. Schwoebel states at ¶71 of his report that "Efficacy means that the medical device has a specific benefit whereas performance means the device performs as it was intended to perform." Yet, what Mr. Schwoebel fails to note is that, in the U.S., a specific benefit may be inadequate to establish "effectiveness." To be effective, a device must provide "a significant portion of the target population" with "clinically significant results," a standard that is not easy to attain.

58.     As previously stated, in order to demonstrate the safety and effectiveness of a class III implantable medical device, an IDE application (as described in ¶27 of my Report) is usually necessary. However, an IDE is not simply "a formal investigation study plan" as Mr. Schwoebel asserts at ¶72 of his report. Rather, an IDE is subject to the requirements of 21 CFR § 812, and is comprised of a Report of Prior Investigations and an Investigational Plan. A Report of Prior Investigations includes all prior bench, animal and clinical testing and is required to be "comprehensive and adequate to justify the proposed investigation."[15] An Investigational Plan is much more than a clinical study protocol and includes information on the device, risk analysis, study monitoring procedures, product labeling, informed consent and institutional review board materials, amongst other things.[16]

59.     Mr. Schwoebel notes at ¶81 of his report that "Investigational studies can be considered 'significant risk' or 'non-significant risk,' with the difference being that FDA approval is required of 'significant risk' studies." What he neglects to mention is that, for

---

HUDs approved under an HDE cannot be sold for profit, except in certain circumstances. *See* http://www.fda.gov/RegulatoryInformation/Guidances/ucm389154.htm
[14] FDA. Guidance for Industry - Supplements to Approved Applications for Class III Medical Devices: Use of Published Literature, Use of Previously Submitted Materials, and Priority Review. 20 May 1998 (emphasis added). http://www.fda.gov/RegulatoryInformation/Guidances/ucm080183.htm
[15] 21 CFR § 812.27
[16] 21 CFR § 812.25

investigational purposes, implanted pulse generators are all considered by FDA to be "significant risk" devices.[17]

60.    Mr. Schwoebel indicates at ¶74 of his report that "Implantable cardiac pacemakers have been evaluated by a special panel of the FDA and determined to be class III medical devices."  If the "special panel" to which he refers is a classification panel, he is partially correct.  Implantable cardiac pacemakers were evaluated by a classification panel over 35 years ago and were the subject of a review and recommendation to FDA to classify the device type in class III, subject to premarket approval.  The subject of this panel review and recommendation and final FDA action is evident in 21 CFR § 870.3610 and is the subject of product code DXY.[18]  Implantable Pacemaker Pulse Generator with Cardiac Resynchronization (CRT-P) devices, product code NKE, are not subjects of 21 CFR § 870.3610.  They are post-amendment class III devices, subject to PMA requirements.  Likewise, Automatic Implantable Cardioverter Defibrillator with Cardiac Resynchronization (CRT-D) devices, product code NIK, are not the subject of 21 CFR § 870.3610.  They are also post-amendments class III devices, subject to PMA requirements.  Neither of these device types have a classification regulation in the Code of Federal Regulations ("CFR").

61.    Mr. Schwoebel's suggestion at ¶74 of his report that there are two basic pathways to obtaining FDA approval to market a class III medical device, i.e., via an original or supplemental PMA application, is misleading, as it overlooks the fact that a completed PDP (as described in ¶35 of my Report) is considered to be the same as an approved PMA.[19]

---

[17] FDA. *Information Sheet Guidance for IRBs, Clinical Investigators, and Sponsors - Significant Risk and Nonsignificant Risk Medical Device Studies*. January 2006.
http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM126418.pdf
[18] "Implantable Pacemaker Pulse-Generator"
http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=792
[19] 21 CFR § 814.19

Furthermore, to be eligible for approval by way of a supplemental PMA, an applicant must have an approved PMA to supplement and then meet certain criteria. Therefore, this pathway is open to only a select few devices under limited circumstances. Regardless, the most accurate way to describe the means to achieve FDA approval to market a class III device is to focus on the statutory threshold for approval, i.e., demonstrating a reasonable assurance of the device's safety and effectiveness. The administrative procedures and the scientific approach by which safety and effectiveness can be demonstrated vary depending on the device and the circumstances, however, the statutory foundation for approval remains constant.

62.     It is incorrect to state that the "determination of whether a Sponsor must submit an original PMA or a PMA Supplement often turns on the 'intended use' and 'indications for use.'" (Schwoebel Report at ¶74.) First, as explained above, not all persons are in a position to submit a PMA Supplement. For those persons who are in such a position, the particular device of interest may not be eligible for review as a PMA Supplement. In FDA's guidance document on the PMA Supplement decision-making process, the Agency states that the type of PMA submission is most dependent on "the nature of the data, if any, that is needed to demonstrate the safety and effectiveness of the modified device."[20] If new preclinical testing and new clinical testing is necessary to demonstrate reasonable assurance of safety and effectiveness of the modified device, FDA advises applicants to "assume that this is a new device that will require a submission of a new traditional PMA."[21] For changes in the indications for use that require new clinical data, with no or limited preclinical testing, FDA identifies "panel-track supplements to

---

[20] FDA. *Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process*. 11 Dec 2008
http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm089360.pdf
[21] *Id.*

be the most appropriate supplement type."[22]  Original PMAs and Panel-Track Supplements are

the only PMA submission types that require clinical data.

63.     Contrary to Mr. Schwoebel's description at ¶78 of his report of "a) traditional

PMA (original) or b) modular PMA (original)" as "two forms of PMA submission," there is no

difference between the contents of a traditional PMA and a modular PMA.  The difference lies in

whether the PMA is complete upon submission or is completed over time through the submission

of different "modules" according to a schedule and plan agreed upon with FDA.  This distinction

is somewhat alluded to in the explanation Mr. Schwoebel provides at n.35, however, he then

goes on to speculate that, "In some situations, Modular PMA can lead to more efficient use of an

FDA's reviewer's time, allowing faster approval."  I disagree.  I know of no data or studies that

establish that modular PMAs are approved any faster than traditional PMAs, and Mr. Schwoebel

does not cite to any in his report.  The speed in which a PMA review is completed is almost

always related to completion of the clinical and biostatistical evaluation of the clinical trial

results.  The last module to be submitted to complete a modular PMA comprises the final clinical

data, the proposed labeling and the Summary of Safety and Effectiveness Data section; the PMA

contents that take the longest to review.

64.     Mr. Schwoebel points out in ¶80 of his report that, "there are few original PMAs

submitted by medical device Sponsors."  Although it is true that there are relatively few original

PMAs submitted each year, it is also true that there are relatively few Panel-Track Supplements

submitted to FDA for approval.  Moreover, the threshold for receiving FDA approval of an

original PMA is no different than for a Panel-Track Supplement.  Both require valid scientific

evidence sufficient to demonstrate a reasonable assurance of safety and effectiveness, and both

---

[22] *Id.*

involve significant regulatory burden.  Both original PMAs and Panel-Track Supplements may

be referred to an expert advisory committee for review and recommendation.  Nearly always,

original PMAs and Panel-Track Supplements are preceded by a clinical trial conducted under an

IDE.

65.     Despite Mr. Schwoebel's assertion at ¶84 of his report, FDA does not routinely

process "PMA supplements for 'new indications for use,' which also include 'changes in the

performance or design specifications, circuits, components, ingredients, principle of operation, or

physical layout of the device.'"  To the contrary, when clinical data and preclinical data are

necessary, FDA advises applicants to submit original PMAs.

66.     The example Mr. Schwoebel cites in ¶79 of his report to support his assertion that

"FDA has historically required new original PMAs for devices representing a 'new intended

use,'" is particularly inapt in that it has absolutely no bearing on whether a device constituting

the Contingent Payment Product would be the subject of an original PMA or panel-track PMA

supplement.  To support his assertion, he identified devices that are not implanted in the

vasculature, and that have a totally different benefit-risk profile than active implantable devices

that are life-supporting and life-sustaining, to a point where they are not subject to premarket

requirements.

67.     Mr. Schwoebel's statement in ¶85 of his report of the "key concept ... that

changes in the 'indications for use' of an approved medical device, which are accomplished by

the modification of existing foundation technology, are typically approved as PMA

Supplements" is inaccurate.  As FDA has stated in its PMA Supplement guidance document,

changes in the indications for use that are associated with changes in device design and

technology are almost always reviewed as original PMAs.

68.     Mr. Schwoebel's account of the review process at ¶¶87-89 of his report lacks detail and depicts greater certainty than exists, particularly for Panel-Track Supplements.  Before developing and implementing an investigational plan, a device must exist that can be sufficiently tested to justify its use on human subjects.  Sufficient preclinical testing must be performed on the device to justify the conduct of a clinical investigation.  An investigational plan can be under simultaneous development, however, a report of prior investigations and an investigational plan must be sufficient to justify submission of an IDE to FDA.  Certainly, if FDA determines that the IDE is adequate, it can be approved.  It is not unusual, however, for an IDE to be denied for any of the reasons identified in the IDE regulation.[23]  After the IDE is approved by FDA, institutional review boards ("IRBs") determine whether a particular clinical study can be conducted at governing institutions.

69.     Assuming that IRB approval is granted and a study begins, the time to completion is dependent on may factors, including an availability of eligible patients, the enrollment rate, and the required minimum follow-up period.  It can take years to enroll a sufficient number of patients and follow the last patient enrolled for the minimum follow-up period.  Once a study is completed, the data is usually compiled and analyzed by the sponsor to determine not only if the study endpoints have been met, but also whether the data is adequate to submit to FDA for review in a PMA submission and whether it can be submitted in an original PMA or Panel-Track Supplement.  During review of a PMA submission, FDA normally asks a number of questions, however, the Agency's objective is not to confirm that the medical device is safe and effective, but rather to determine if the device is safe and effective.  With FDA, there is no presumption of safety or effectiveness.  It is not unusual for the PMA review process to exceed 180 days.  Only if and when FDA determines that the data establishes a reasonable assurance of the specific

_____

[23] 21 CFR § 812.30(b)

device's safety and effectiveness will the submission be approved allowing the device to be commercially distributed in the U.S.

70.     Despite Mr. Schwoebel's statements at ¶¶94-98 of his report, any assertion that the "Contingent Payment Product" would be approved is completely speculative.  Only FDA is capable of determining when sufficient information and data exists and is adequate to justify an approval.  While BSC has FDA approval to commercially distribute devices intended for CRT, this fact does not guarantee approval of any new devices or modifications to existing approved devices.  The concept of intended use is considered ambiguous by many regulatory affairs professionals, however, in the context of PMA submissions, intended use is not determinative of the path to market or the degree of certainty that a PMA will be approved.

71.     Mr. Schwoebel's account at ¶¶107-109 of his report regarding CeloNova Biosciences' experience achieving clearance of its Embozene® microspheres through the 510(k) process for embolization of hypervascular tumors and arteriovenous malformations is inaccurate and irrelevant.[24]  Not only is it extremely unlikely that FDA would ever rely on clinical data on the treatment of uterine fibroids to grant clearance for the treatment of hypervascular tumors and arteriovenous malformations, the 510(k) summary on FDA's website clearly states that clinical data was not required for the clearance of K073417.  Furthermore, the 510(k) process is not comparable to the PMA process and the words "clearance" and "approval" are not synonymous. In fact, if CeloNova Biosciences referred to the clearance of K073417 as a FDA approval, the company would have committed a prohibited act.[25]  While CeloNova Biosciences recently received clearance from FDA for the treatment of uterine fibroids, the 510(k) summary

---

[24] See information of 510(k) number K073417 at http://www.accessdata.fda.gov/cdrh_docs/pdf7/K073417.pdf
[25] Refer to 21 CFR § 807.97.

establishes that more clinical experience was required than the observational study of 50 subjects

in Europe to which Mr. Schwoebel's expert report refers.[26]

72.     Mr. Schwoebel also states in ¶44 of his report with respect to seeking European

and U.S. regulatory approval that "BSC, if it had actually taken steps to obtain regulatory

approval, likely would have undertaken parallel paths in the EU and FDA."  Mr. Schwoebel goes

on to state that, "BSC would have obtained results from [EU] studies to show efficacy of the

Contingent Payment Product," and that "While BSC was obtaining that data in Europe, BSC

would have defined a 'formal development project' for evaluating Action Medical's 'Contingent

Payment Product,' wherein an early step would have been to schedule a 'pre-submission

meeting' with the FDA."  (Schwoebel Report at ¶¶110-111.)  What Mr. Schwoebel fails to

recognize, however, is that a manufacturer is unlikely to be successful in fast-tracking FDA

regulatory approval by seeking to "parallel" its regulatory efforts in the EU.  This is because, if

seeking to maximize the chances of having FDA consider its EU clinical data as valid scientific

evidence, a prudent manufacturer will approach the FDA at the pre-IDE stage in order to have

them review the proposed EU protocols *prior* to beginning clinical trials in the EU.  This strategy

therefore serves to *prolong* the amount of time before the manufacturer is able to begin its

clinical studies.  Furthermore, even if studies are carried out in the EU in accordance with

protocols that were reviewed by FDA at the pre-IDE stage, FDA is still likely to require

additional trials in the U.S.

73.     Moreover, while BSC could have prepared and submitted a "pre-submission" and

requested a meeting with the Agency, this is a completely discretionary activity.  Sufficient

details regarding the specific device of interest must exist prior to doing so, including preclinical

and clinical information and proposed testing, in order for the pre-submission process to be a

---

[26] http://www.accessdata.fda.gov/cdrh_docs/pdf13/K133447.pdf

worthwhile investment of time and resources, and still there would be no guarantees that BSC

would have received information of value.  Because pre-submissions are processed at the lowest

levels within the review organizations, without any appreciable upper management oversight,

differences of opinion between submitters and FDA review scientists can be difficult to resolve

and can result in delays in getting official Agency feedback.

74.     Mr. Schwoebel's characterizations at ¶114 of his report of BSC's "intended use"

for the devices that are the subjects of approved PMA numbers P030005 and P010012 is

completely contrived.  FDA does not develop statements of intended use for devices that are the

subjects of PMAs.  To do so would be extremely complex and serve no useful purpose.

Furthermore, FDA's views on the intended use of a device can change in an instant, through

either intentional or unintentional actions by an applicant, rendering any prior FDA statement

that had been developed meaningless.  To illustrate how seriously flawed Mr. Schwoebel's

portrayal of BSC's intended use is for each approved device, consider that he fails to mention in

his description the fact that subject devices are restricted to use by or on the order of "physicians

trained or experienced in device implant and follow-up procedures."  Restrictions on device use

that are imposed by FDA are an important and obvious part of a device's intended use.[27]

Nevertheless, this restriction does not appear in Mr. Schwoebel's depiction of the intended use of

BSC's approved devices.

75.     Mr. Schwoebel's representation in ¶114 of the indications for use for the devices

that are the subjects of approved PMA numbers P030005 and P010012 is completely inaccurate.

To illustrate the degree of inaccuracy, compare Mr. Schwoebel's depictions versus the ones

found in each PMA approval order issued by FDA (**TABLE 3**).

---

[27] FDA. Deciding When to Submit a 510(k) for a Change to an Existing Device. 10 Jan. 1997.
http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080243.p
df

TABLE 3 – Comparison of Indications for Use for BSC PMAs

| PMA Number | Indication for Use (Schwoebel) | Indication for Use (FDA Approval Order) |
|---|---|---|
| P010012 | Heart Failure (Slow Heartbeat Condition) | Approval for the contak cd crt-d system and the easytrak coronary venous steroid-eluding single-electrode pace/sense lead, models 4510, 4511, 4512 and 4513. The contak cd crt-d system is indicated for patients who are at high risk of sudden cardiac death due to ventricular arrhythmias and who have moderate to severe heart failure (nyha class iii/iv) including left ventricular dysfunction (ef <= 35%) and qrs duration >= 120 ms and remain symptomatic despite stable, optimal heart failure drug therapy. Patient populations at high risk of sudden cardiac death due to ventricular arrhythmias include, but are not limited to, those with: 1) survival of at least one episode of cardiac arrest (manifested by the loss of consciousness) due to a ventricular tachyarrhythmia. 2) recurrent, poorly tolerated sustained ventricular tachycardia (vt). Note: the clinical outcome of hemodynamically stable, sustained-vt patients is not fully known. Safety and effectiveness studies have not been conducted. 3) prior myocardial infarction, left ventricular ejection fraction of <= 35%, and a documented episode of nonsustained vt, with an inducible ventricular tachy-arrhythmia. Patients suppressible with iv procainamide or an equivalent antiarrhythmic (drug) have not been studied. The easytrak coronary venous steroid-eluding single-electrode pace/sense lead, models 4510, 4511, 4512 and 4513 are transvenous leads intended for chronic left ventricular pacing and sensing via the coronary veins when used in conjunction with a compatible guidant cardiac resynchronization therapy (crt) device. |
| P030005 | Heart Failure (Slow Heartbeat Condition) | The CONT AK RENEWAL TR pulse generator is indicated for patients who have moderate to severe heart failure (NYHA Class IIVIY) including left ventricular dysfunction (EF S 35%) and QRS duration~ 120 ms and remain symptomatic despite |

| PMA Number | Indication for Use (Schwoebel) | Indication for Use (FDA Approval Order) |
|---|---|---|
| | | stable, optimal heart failure drug therapy (as defined in the clinical trials section). The device provides atrial-ventricular tracking modes to help preserve A V synchrony, and adaptive-rate pacing for patients who would benefit from adjusted pacing rates concurrent with physical activity |

76.    Mr. Schwoebel's assessment at ¶115 of his report of BSC's PMA experience related to PMA numbers P030005 and P010012 is completely inaccurate; suggesting that his knowledge of the PMA process is limited.  He maintains that BSC's PMAs have been supplemented hundreds of times.  In fact, a substantially lower number of PMA supplements have been submitted and approved by FDA than alleged by Mr. Schwoebel.  It seems that Mr. Schwoebel bases his accounting and opinions on the numbers of PMA "supplements" that appear on FDA's publicly available database, misapprehending the fact that FDA assigns supplement numbers for all post-approval submissions, regardless of whether each submission is actually a PMA Supplement.  My assessment of the numbers of PMA Supplements that are identifiable from FDA's public database in regard to BSC's two PMAs, as of July 1, 2015, appears in **TABLE 4** (below).

**TABLE 4** – Characterization of all BSC Post-Approval Submission as of July 1, 2015

| PMA Number | P030005 | | P010012 | |
|---|---|---|---|---|
| | N | % | N | % |
| 30-Day Notices | 83 | 73% | 226 | 63% |
| 30-Day Notices converted to 135 day supplements | 6 | 5% | 18 | 5% |
| Special PMA Supplements- Change being affected | 1 | 1% | 10 | 3% |
| Real-time supplements | 16 | 14% | 67 | 19% |
| 180-day supplements | 7 | 6% | 36 | 10% |
| Panel-track supplements | 0 | 0% | 3 | <1% |
| **Total submissions** | **113** | **100%** | **360** | **100%** |

77.    It is rather striking that an overwhelming majority of submissions that Mr. Schwoebel identifies as PMA Supplements are actually 30-Day Notices.  According to 21 CFR §

- 33 -

814.39(f), the types of changes that are eligible for review as 30-Day Notices "do not require the submission of a PMA supplement." **EXHIBIT C** includes a snapshot of FDA's PMA database that shows how 30-Day Notices related to manufacturing changes are identified.

78.     It is equally as striking that of the true PMA supplements, most are for straightforward changes, i.e., changes that do not consume significant FDA review time (specifically, 135-Day Supplements for manufacturing changes, Special PMA Supplements that do not require FDA approval, and Real-Time Supplements that are generally reviewed by a single FDA review scientist. **EXHIBIT D** includes a snapshot of FDA's PMA database that shows how 135-Day Supplements related to manufacturing changes are identified.  Of the remaining PMA supplements, most are 180-Day PMA supplements and some identified as such relate to post-approval study requirements and not modifications that affect the safety and effectiveness of the approved devices.  **EXHIBIT E** includes a snapshot of FDA's PMA database that shows how 180-Day Supplements related to post-approval study requirements are identified.  Less than 1% of BSC's total post-market PMA submissions have been designated by FDA as "Panel-Track Supplements" revealing that they include clinical data.  **EXHIBIT F** includes a chart depicting FDA's approval of active implantable cardiac devices via the original and supplement PMA pathways during the time period between 1979 to 2012.  This chart confirms the fact that relatively few Panel-Track Supplements are approved by FDA.

79.     Mr. Schwoebel asserts that "the Contingent Payment Product is achieved by *adaptation* of products for which BSC has already obtained approval within the context of existing PMAs." (Schwoebel Report at ¶123) (emphasis added).  Adaptation infers change and the degree of change is usually the determinative factor that dictates the pathway to the U.S. market.  Mr. Schwoebel then makes the following statement in ¶124 of his report:

- 34 -

Data for all of the system components that comprise the "Contingent Payment Product" could be submitted within a single PMA Supplement of P030005, and would include the bench data, animal data and clinical study data typically required for a PMA Supplement of this type. Such data would include (1) summaries of all relevant engineering laboratory tests performed (for example, electrical characterization, waveform outputs displayed on oscilloscopes, electrical output impedance measurements, mechanical characterization of lead connector interface), (2) in vivo animal studies (for example, evaluations in canines, rabbits or other animals), and (3) human clinical data (for example: biographic summary of previous studies performed and published on para-hisian pacing, summary of feasibility study performed by Dr. Ortega in Argentina, description of competitive studies underway as reflected on the government website http://www.clinicaltrials.gov and actual human-use clinical evaluation performed under CTA in the EU).

I do not agree. Changes in approved devices that require the submission of bench data, animal data and clinical study data often justify the submission of an original PMA. Original PMAs that are based on clinical data from anything other than a prospective trial conducted in the U.S. on the device that is the subject of the PMA are extremely difficult, possibly impossible, to get FDA to approve. I would certainly not characterize any effort to get such a device approved as "very easy to do, because it would essentially be 'cut- and-paste' or duplication of the same information previously provided as a PMA Supplement," as Mr. Schwoebel does at ¶125 of his report.

80.     Likewise, there is also no basis to conclude that "the FDA review process would have been straightforward" or that "FDA would issue an approval letter for the PMA Supplement, as they have already done hundreds (100s) of times as clearly shown in Appendices E and F." (Schwoebel Report at ¶127.) As has already been established, the hundreds of PMA supplements that Mr. Schwoebel cites as purportedly supporting his opinion that "BSC would have obtained FDA approval for the Contingent Payment Product" are not even PMA Supplements.

81.     Mr. Schwoebel's approach to determining the percent of PMA supplement approvals is also inaccurate.  As explained above, he has mischaracterized hundreds of 30-Day Notices as PMA Supplements and has made no effort to differentiate straightforward supplements from those that are more challenging.  As a result, there are gross inaccuracies in the denominators and numerators he has used for calculating percentages.  Furthermore, FDA does not publicly disclose any information on pending PMA submissions, or on PMA submissions that are the subjects of "approvable" or "not-approvable" letters.  It is totally inappropriate to conclude that the numbers of supplements approved in a particular time period, and the highest FDA supplement number[28] to receive approval in the same time period, can be used to calculate a percentage of PMA Supplement submissions that were approved by FDA. The sheer number of PMA submissions mischaracterized as PMA Supplements by Mr. Schwoebel, combined with his crude estimate for the number of PMA Supplements submitted for FDA review, renders his calculated percentages of "approvals" to be meaningless.  When this is coupled with the facts that: (1) some pre-submission interactions with FDA may prompt companies not to pursue certain changes, (2) some PMA supplements are not accepted for review by FDA, and (3) submissions bearing higher FDA assigned supplement numbers may be pending at the end of any time period, it has to be concluded that Mr. Schwoebel's assessments are completely without merit.

---

[28] A sequential number that is assigned to all post-approval PMA submissions, regardless of whether they constitute PMA supplements in accordance with 21 CFR § 814.39.

August 3, 2015

Philip J. Phillips

**EXHIBIT A**

# PHILLIPS CONSULTING GROUP, LLC

P. O. Box 39
McHenry, Maryland  21541
Telephone – 202-420-9042

## RESUME

### Philip J. Phillips

## EDUCATION

| | |
|---|---|
| 1982 | MBA, George Washington University, School of Government and Business Administration, Washington, DC |
| 1976 | BS, Microbiology, University of Maryland College Park, MD |

## EXPERIENCE

### Current

**President**
**PHILLIPS CONSULTING GROUP, LLC**
**P. O. Box 39**
**McHenry, Maryland  21541**

Philip J. Phillips is President **PHILLIPS CONSULTING GROUP, LLC.** The firm provides strategic scientific and regulatory consulting services to clients and their counsel on public health related issues, with a focus on managing the most challenging issues in regulatory, public policy, and litigation forums.  Mr. Phillips has 34 years of experience in FDA regulation of medical devices, having focused on the development and implementation of numerous regulatory strategies regarding the design, manufacture and distribution of medical devices and combination products in the United States.  He brings an in-depth knowledge of a wide range of regulatory matters, including FDA jurisdiction and compliance, device classification and premarket review, clinical trials, human subject protection, product labeling, promotion and advertising, and post-marketing surveillance.  His device experience crosses all medical specialties, including *in vitro* diagnostic devices.

**Previous Positions**

2005-2009        Executive Vice President and
                 Director, Medical Device Practice
                 Becker & Associates Consulting, Inc.
                 Washington, D.C.

Becker & Associates Consulting is a Washington, D.C.- based consulting firm that
focuses on the needs of FDA regulated industry.  As the Executive Vice President and
Director of the Medical Device Practice, Mr. Phillips managed the day-to-day demands
of the practice by ensuring that the firm's healthcare clients and their counsel received
sound strategic scientific and regulatory advice.  Mr. Phillips used his business
background and his 24 years of experience in FDA regulation of medical devices to
develop and implement numerous successful regulatory strategies to achieve FDA
authorization to distribute innovative medical devices in the United States while
maintaining compliance with FDA requirements.  Mr. Phillips' in-depth knowledge of
allowed the firm to expand services to all medical device sectors, including *in vitro*
diagnostic industry.


1994-2005        Deputy Director, Science and Regulatory Policy
                 Office of Device Evaluation
                 United States Food and Drug Administration
                 Center for Devices and Radiological Health
                 Rockville, Maryland

The Office of Device Evaluation (ODE) is the organizational unit in FDA that is
responsible for the premarket evaluation of medical devices intended for commercial
distribution in the United States.  ODE applies principles of sound science and exercises
good regulatory judgment in the review of safety and effectiveness data and in granting
medical device market authorizations.  As the Office's chief scientist and administrator,
Mr. Phillips planned, managed and directed all premarket review programs that ensure
the safety and effectiveness of medical devices marketed and used in the United States.
Mr. Phillips provided executive leadership in managing and directing six review divisions
that encompassed all medical specialties, three support staffs, and a total work force of
over 300 scientists, engineers and clinicians.

2003-2005        Acting Deputy Director, Office of Science and Engineering Laboratories
                 United States Food and Drug Administration
                 Center for Devices and Radiological Health
                 Rockville, MD

The Office of Science and Engineering Laboratories (OSEL) performs product testing;
develops reliable standardized test methods for government and industry use; performs
anticipatory scientific investigations on emerging technologies; contributes laboratory
data to national and international standards used in CDRH decision making; provides
scientific and technical training for CDRH staff members; and maintains laboratory

**REVISION – 08-2014**

collaborations and relationships with scientific researchers in academia and other Federal laboratories.  OSEL also coordinates and oversees CDRH's activities that support the development of national and international standards.  Mr. Phillips integrated OSEL's laboratory scientists into ODE's premarket review programs, including a streamlined guidance development initiative for the Commissioner of Food and Drugs.

1987-1994     Director of Program Operations, ODE

1993-1993     Interim Director, Division of General and Restorative Devices, ODE

1986-1987     Acting Deputy Director, Division of Ophthalmic Devices, ODE

1984-1987     Branch Chief, Surgical and Diagnostic Devices Branch
              Division of Ophthalmic Devices, ODE

1981-1984     Interdisciplinary Scientist, Division of Ophthalmic Devices, ODE

1979-1981     Research Biologist
              Enviro Control, Inc.
              Rockville, MD  20852

1976-1979     Clinical Microbiologist
              Prince George's General Hospital and Medical Center
              Cheverly, MD  20745

## Committee Participation

Xavier University MedCon Planning Committee 2013-Present
FDLI Medical Device Committee Chair 2006-2010
FDLI Medical Device Committee 2000-2010
Radiofrequency Identification (RFID) Working Group 2004-2005
Tobacco Legislation Working Group 2004
Project BioShield Implementation Team 2003-2005
Industry Least Burdensome Task Force 2000-2001
CDRH Management Council 1996-2005
FDA Good Guidance Practices Working Group 1996-1997
Management Action Plan Development Team 1993
Human Tissue Products Working Group 1987-1988
Postmarket Product Management Steering Committee 1987
Ophthalmic PMS Committee (Chairperson) 1986-1988
Ophthalmic Program Management System (PMS) Committee 1983-1985

**Representative examples of the scope of experience**

- As Executive Vice President and Director, Medical Device Practice at Becker & Associates Consulting, Inc., developed and implemented innovative regulatory strategies for new and complex medical technologies from across all medical device panels, including combination products and *in vitro* diagnostics.  Prepared premarket submissions including IDEs, 510(k)s, and PMAs.  Provided strategic support for clients at Advisory Committee meetings, including review of premarket submissions, classification actions, and dispute resolution panels.  Served as an expert witness in support of numerous civil litigation suits including product liability and patent dispute, many for which required testimony and deposition.

- Streamlined premarket evaluation processes and reduced the time required for safe and effective medical devices to receive Agency marketing authorization.  In the premarket approval (PMA) program, introduced "modular review," revived product development protocols (PDPs) and instituted numerous procedures designed to streamline agency review and decision-making.  In the premarket notification (510(k)) program, applied a "systems approach" to design and institute the most sweeping changes in the history of the program, relying on voluntary standards, guidance documents and design control requirements in lieu of the submission and in-depth analysis of data.  In the investigational device exemptions (IDE) program, instituted procedures that have allowed greater access by the American public to promising new and emerging medical technologies while continuing to provide a high level of protection of the rights, safety and welfare of study participants.

- Ensured that the proper statutory and regulatory requirements were consistently applied across all ODE review divisions in the evaluation of 20,000 premarket submissions each year and that the appropriate testing and evaluation was performed on the devices before they were cleared for marketing or permitted to be used in clinical trials.

- As a nationally and internationally recognized authority on all aspects of medical device regulation, provided expert guidance, interpretation, and recommendations to senior Agency and Departmental officials; scientific, medical, and professional personnel, industry representatives; intra/inter-governmental counterparts and others on medical device policies, regulations, and law.  Represented the agency at meetings and conferences with Departmental officials; representatives of the regulated industry, healthcare community, national and international scientific and health-related professional organizations; the United States Congress and representatives from foreign governments and Federal, State and local agencies.

- Over 24 year career with ODE, solved numerous complex regulatory and scientific problems that affected the organization ability to effectively carry out its mission. Accepted numerous short-term assignments to address problem situations, including accumulation of backlogs in pending premarket submissions.

- In November 2002, developed and presented a regulatory strategy for the FDA review of implantable radiofrequency microchips at the National Academy of Sciences. Implemented the strategy involving the Evaluation of Automatic Class III Designation (de novo classification) program resulting in Implantable Radiofrequency Transponder Systems being classified as class II devices, exempt from 510(k) requirements (21 CFR 880.6300).

- In cooperation with AdvaMed's Least Burdensome Industry Task Force, developed and issued the guidance document entitled *The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles*.

- Developed and implemented a regulatory strategy for the approval of a PMA for an implantable pulse generator for the treatment of pain based on preclinical testing and an evaluation of peer reviewed literature. The Genesis$^{TM}$ Neurostimulation (IPG) System by Advanced Neuromodulation Systems, Inc. was evaluated and approved by FDA in less than 180 days (P010032).

- Classified Acute Upper Airway Obstruction Devices through de novo classification process into class II, exempt from 510(k) requirements (K993284) with the exemption principally based on conformance with design control requirements under the quality system regulation (21 CFR 868.5115).

- Developed and implemented an interagency agreement with the Centers for Medicare & Medicaid Services (formerly the Healthcare Finance Administration) for the categorization of all clinical investigations of medical devices permitting reimbursement for a majority of investigational medical devices for the first time in the history of the Medicare program.

- Signed the approval order for the first Humanitarian Device Exemption authorizing distribution of the Harrison Fetal Bladder Stent (Lowery Modification) by Cook OB/GYN$^{R}$ on September 14, 1997 (H960001).

- In cooperation with the medical device industry, developed and issued the guidance document entitled *Deciding When to Submit a 510(k) for a Change to an Existing Device* that addresses which changes or modifications to devices are subject to 510(k) requirements (Blue Book Memorandum K97-1).

- Provided intermittent training for all advisory panel members on the Federal Food, Drug, and Cosmetic Act and medical device regulation.

- Functioned as an expert witness for the government in numerous court cases relating to medical device regulation.

- Provided expert advice to CDRH's Office of Compliance, FDA's Office of General Counsel and the Department of Justice regarding enforcement activities relating to medical devices.

- Functioned as ODE's principle arbiter of scientific and regulatory disputes with the regulated industry regarding decisions affecting individual premarket submissions, including, data requirements, appeals of not filing decisions for PMAs and not substantially equivalent determinations for 510(k)s.

- Developed and implemented the concept of special controls guidance documents for class II devices as a means of promoting abbreviated 510(k) submissions and least burdensome premarket requirements.

- Developed a streamlined guidance document development program, integrating national and international consensus standards, in support of the Commissioner of Food and Drug's Critical Path Initiative to reduce regulatory burden for industry and facilitate the agency's premarket review of medical devices.

- As the Director of Program Operations, provided overall direction, coordination, and advice to the Director, Office of Device Evaluation, the Center Director, and the agency for the establishment, development, and operation of the Office's IDE, PMA, 510(k), and reclassification efforts. Specific responsibilities included the review and evaluation of decisions and recommendations rendered by the ODE review divisions concerning IDEs, PMAs, 510(k)s and reclassification petitions; the development and administration of regulations and guidance documents regarding the Office's program areas; the development, implementation and evaluation of the Office's document tracking system, including data collection and analysis of the Office's overall performance; and being a spokesperson for the Agency on all matters of policy, procedures and requirements pertaining to the premarket evaluation of medical devices.

- As the Interim Director of the Division of General and Restorative Devices, lead and directed the planning, organization and execution of the responsibilities of ODE's largest review division. Responsibilities included; all scientific and regulatory recommendations and decisions made by the division regarding dental, infection control, general hospital, plastic and reconstructive, restorative and orthopedic devices; all recommendations to the Office Director concerning original PMAs and IDEs, as well as petitions for reclassification; and all decisions regarding supplemental IDE and PMA applications and 510(k)s, as well as the activities of the Division's advisory panels.

- As the Acting Deputy Director of the Division of Ophthalmic, lead and managed the Division's investigational device exemption program for all significant risk ophthalmic device clinical investigations, including investigations involving contact lenses and related products, intraocular lenses and surgical/diagnostic devices. Streamlined the processes by which the Division evaluated all regulatory submissions involving ophthalmic devices.

REVISION – 08-2014

- As the Chief of the Surgical and Diagnostic Devices Branch within the Division of Ophthalmic Devices, planned and organized the activities of the individual branch members in the review and evaluation of PMAs, IDEs, and 510(k)s involving surgical and diagnostic ophthalmic devices. Developed a broad understanding of the diverse scientific disciplines that are necessary for the responsible regulation of the ophthalmic medical device industry.

- As a team leader in the Division of Ophthalmic Devices, managed review teams responsible for the evaluation of PMAs, IDEs, and 510(k)s. Coordinated the complete scientific and regulatory evaluation of the submissions and made recommendations regarding their approvability to senior Division management.

- As an interdisciplinary scientist, evaluated scientific information and data regarding the safety and effectiveness of ophthalmic medical devices. Functioned principally as a microbiologist, but relied on knowledge in other scientific disciplines to evaluate virtually all aspects of device performance.

- As a board certified Clinical Microbiologist with the American Society of Clinical Pathology (M., A.S.C.P.), performed diagnostic procedures involving the differentiation, isolation and identification of microorganisms from body fluids and sites, insured that quality control criteria were met before computerized patient diagnostic reports were prepared and forwarded to attending physicians, and evaluated new or modified diagnostic techniques and methods.

## PROFESSIONAL AFFILIATIONS

Food and Drug Law Institute (FDLI)
Regulatory Affairs Professional Society (RAPS)
American Society of Clinical Pathologists (ASCP)
Food and Drug Administration Alumni Association (FDAAA)


## PUBLICATIONS

Kessler L, Phillips PJ. 2010. Premarket Notification: A Key Element of US Medical Device Regulation. *Public Health Effectiveness of the FDA 510(k) Clearance Process: Balancing Patient Safety and Innovation*. Workshop Report. Washington, D.C. Institute of Medicine of the National Academies. 75-112

Phillips PJ, Zielinski KM. 2008. Claims and 510(k) requirements: An area of uncertainty for medical devices. *Update* May/June 2008:14-17.

McTyre RB, Suh R, Phillips PJ, Levy B. 2007. On the utility of non-epidemiology data in assisting with interpretation of case-control study results: The Bausch & Lomb case. Submitted for publication. *Annals of Epidemiology*. Atlanta, GA: American College of Epidemiology.

REVISION – 08-2014

Phillips, PJ and Lynne, JC.  2005.  Unnecessary 510(k) Filings: A Waste of FDA and Industry Resources.  *Regulatory Affairs Journal (Devices)* 13:341-345.

Brown, RP, Stratmeyer, ME, Alonge, LA, Phillips, PJ. 2003. Use of Safety Assessment to Support Regulatory Decision Making and Risk Communication Efforts in CDRH; DEHP in PVC Medical Devices (W-01).  *9th Annual Science Forum-FDA Science: Protecting America's Health- Abstracts,* 189.

Phillips, PJ, Less, JR. 1999.  The Development of a New 510(k) Program.  *Medical Device & Diagnostic Industry,* 21(6), 151-159.

Marlowe, DE, Phillips, PJ. 1998.  FDA Recognition of Consensus Standards in the Premarket Notification Program.  *Biomedical Instrumentation & Technology*, 32(3), 301-304.

Phillips, PJ. 1996.  EMC Information for Premarket Approval of Medical Devices.  *Electromagnetic Compatibility for Medical Devices: Issues and Solutions.*  Arlington, VA: Association for the Advancement of Medical Instrumentation.

Phillips, PJ. 1994.  Medical Lasers; FDA Review and Regulatory Status.  *Medical Laser Marketplace '94.*  Nashua, NH: PennWell Publishing Company.

## INVITED PRESENTATIONS *(selected)*

18th. Annual Meeting of the National Electrical Manufacturer's Association's (NEMA's) Diagnostic Imaging and Therapy Systems Division
San Diego, CA  September 1993

Medical Laser Marketplace '94
Los Angeles, CA  January 1994

HIMA Meeting on Product Approval Initiatives
Washington, DC  May 1994

HIMA Board of Directors Meeting
Washington, DC  June 1994

FDLI Device Update Conference
Washington, DC  June 1994

Division of Small Manufacturer's Assistance (DSMA) Device Submissions Workshop
Boston, MA  July 1994

4th. Annual HIMA Device Submissions Workshop
Crystal City, VA  July 1994

19th. Annual Meeting of NEMA's Diagnostic
Imaging and Therapy Systems Division
Martha's Vineyard, MA  September 1994

International Conference on Medical Devices
Minneapolis, MN  September 1994

CAL BIO Summit '94
LaJolla, CA  October 1994

Biomedical Engineering Society (BMES) Annual Meeting
"Frontiers in Biomedical Engineering"
Tempe, AZ  October 1994

HIMA Annual Meeting
Washington, DC  October 1994

American Society for Cataract and Refractive Surgery
"Congress on Ophthalmic Management"
San Diego, CA   April 1995

BIOEAST '95
Washington, DC  January 1995

American Society for Laser Medicine and Surgery (ASLMS) Annual Meeting
San Diego, CA  April 1994

Radiology Centennial Commemorative Conference
National Institutes of Health (NIH)
Bethesda, MD  May 1995

FDA: Third-Party Review of Premarket Notifications Workshop
Rockville, MD  June 1995

Howard A. Paul Memorial Symposium
Washington, DC  June 1995

American Academy of Ophthalmology Spring Symposium
Seattle, WA  June 1995

FDA/American Association for Medical Instrumentation (AAMI) Electromagnetic
Compatibility Conference
Anaheim, CA  May 1995

FDLI Medical Device Seminar
Washington, DC  June 1995

REVISION – 08-2014

FDLI Medical Device Update
Washington, DC  June 1995

5th. Annual HIMA Device Submissions Workshop
Washington, DC  July 1995

FDA Southwest Region Grassroots Meeting
Denver, CO  August 1995

BIO West '95
San Jose, CA  October 1995

NIH Biomaterials and Medical Implant Science Workshop
Bethesda, MD  October 1995

FDA Science Advisory Board Meeting
Arlington, VA  November 1995

FDA/FDLI Video teleconference
Rockville, MD  April, 1996

American Society for Artificial Internal Organs (ASAIO) Annual Meeting
Washington, DC  May 1996

HIMA Meeting on FDA Advisory Committee Meetings
Washington, DC  June 1996

Association of Food and Drug Officials (AFDO) Medical Device Workshop
San Francisco, CA  June 1996

FDLI Medical Device Update
Washington, DC  June 1996

6th. HIMA Annual Device Submissions Workshop
Washington, DC  July 1996

FDA Field Committee Meeting
Potomac, MD  August 1996

RAPS Annual Meeting
Washington, DC  September 1996

Medical Alley FDA Seminar
Minneapolis, MN  December 1996

HIMA 510(k) Task Force Meeting
Washington, DC  April 1997

REVISION – 08-2014

7th Annual HIMA Device Submissions Workshop
Washington, DC  July 1997

Indiana Medical Device Manufacturers Council
Indianapolis, IN  August 1997

HIMA Board of Directors Meeting
Washington, DC  September 1997

FDA/FDLI Video Teleconference
Rockville, MD  October 1997

FDLI Medical Device Update '97
Washington, DC  December 1997

FDA/FDLI Video Teleconference
Rockville, MD  February 1998

Hearing Industry Association Annual Meeting
Sarasota, FL  February 1998

ASLMS Annual Meeting
San Diego, CA  April 1998

FDA Intended Use Workshop
Rockville, MD  June 1998

FDA/FDLI Video teleconference
Rockville, MD  July 1998

8th Annual HIMA Device Submissions Workshop
Washington, DC  July, 1998

FDLI 42nd Annual Educational Conference
Washington, DC  December 1998

FDLI Medical Device Update 1999
Washington, DC  March 1999

ASLMS Annual Meeting
Orlando, FL  April 1999

9th Annual HIMA Device Submissions Workshop
Washington, DC  July 1999

RAPS Annual Meeting
Washington DC  October 1999

Medical Technology Leadership Forum
United States Capitol, Washington, DC  October 1999

HIMA Workshop "Getting to Market Sooner"
Washington, DC  December 1999

BEMA Roundtable
Washington, DC  February 2000

10th. Annual AdvaMed Device Submissions Workshop
Washington, DC  July 2000

Medical Alley Device Workshop
Minneapolis, MN  December 2000

AAMI/FDA/AdvaMed Conference on Standards
Rockville, MD  January 2001

FDLI/FDA Educational Conference
Washington, DC  April 2001

11th. Annual AdvaMed Device Submissions Workshop
Washington, DC  June 2001

American College of Cardiology (ACC)/FDA Workshop
Bethesda, MD  June 2001

Medical Device Manufacturers Association (MDMA) 2001 Annual Meeting
Washington, DC July 2001
RAPS Annual Meeting
Baltimore, MD  October 2001

FDLI Annual Conference
Washington, DC  April 2002

12th Annual AdvaMed Device Submissions Workshop
Rockville, MD  June 2002

Human Microchip Symposium
National Academy of Sciences
Washington, DC November 2002

FDLI Annual Conference
Washington, DC  April 2003

13th Annual AdvaMed Device Submissions Workshop
Washington, DC  June 2003

FDLI Annual Conference
Washington, DC  April 2004

14th Annual AdvaMed Device Submissions Workshop
Washington, DC  June 2004

AAMI/FDA/AdvaMed Conference on Standards
Arlington, VA  February 2005

CDRH Staff College – Instructor
Rockville, MD  1995-2005

Fiftieth Annual FDLI & FDA Educational Conference: Cutting Edge Innovations:
Balancing Safety and Rewards for Healthier Lives
Bethesda, MD  April 2007

Second Annual Medical Device Regulatory, Reimbursement and Compliance Congress,
Cambridge, MA  March 2007

ILSI Biomed Israel - FDA Today: An Expert Symposium for Scientists, Venture
Investors, and Corporate Executives
Tel Aviv, Israel  June 2007

AdvaMed conference on The Use of Standards in Submissions
Bethesda, MD  November 2007

Regulatory Affairs Professionals Society – Horizons Conference & Exhibit
San Francisco, CA  March 2007

Food and Drug Law 101 and Introduction to Medical Device Law and Regulation
Workshop: Understanding How FDA Regulates the Medical Device Industry
Rockville, MD  May 2007, 2008

FDLI Annual Meeting
Washington, D.C.  May 2008

Regulatory Affairs Professionals Society – Advertising, Promotion and Labeling
Conference
Baltimore, MD  May 2008

Medical Device Congress
Boston, MA  March 2008

REVISION – 08-2014

Johnson & Johnson Regulatory Affairs Summit
New Brunswick, NJ  October 2008

Medical Device Manufacturers Association
San Francisco, CA  October 2008

Medical Device Manufacturers Association
Boston, MA  March 2009

FDLI Annual Meeting
Washington, D.C.  May 2009

House Energy and Commerce Committee
Subcommittee of Health
Washington, D.C.  June 2009

Phoenix CEO Conference
Las Vegas, NV  October 2009

Morgenthaler Ventures 4th Annual CEO Summit
San Francisco, CA  November 2009

Georgetown University
Washington, D.C.  February 2010

FDLI Introduction to Food and Drug Law Workshop
Washington, D.C.  March 2010

MDMA Premarket Approval and Premarket Notification Seminar
Palo Alto, CA  March 2010

FDLI 2010 Annual Meeting
Washington, D.C.  April 2010

Institute of Medicine (IOM)
Public Health Effectiveness of the FDA 510(k) Clearance Process: Workshop 1
Washington, D.C.  June 2010

AdvaMed 2010: The MedTech Conference
Washington, D.C.  October 2010

Medical Technology Learning Institute
National Harbor, MD  November 2010

Medtech 10: North Carolina Device Forum
Durham, NC  November 2010

AdvaMed Combination Products Workshop
Washington, D.C.  March 2011

MDMA Premarket Approval Application (PMA)
and Premarket Notification Submission (510(k)) Seminar
Waltham, MA  March 2011

Medcon 2011: FDA/Xavier University Medical Center Conference
Cincinnati, OH  May 2011

Institute for Health Technology Studies Press Conference Re: Northwestern University
Survey, National Press Club
Washington, D.C.  May 2011

Medical Device Quality Conference
Rockville, MD  June 2011

MD&M East
New York City, NY  June 2011

Cleveland FES Center, Metro Health Medical Center
Cleveland, OH  September 2011

DiabetesMine Innovation Summit at Stanford University
Palo Alto, CA  September 2011

AdvaMed 2011: The MedTech Conference
Washington, D.C.  September 2011

AdvaMed 510(k) Submissions Workshop
Washington, D.C.  October 2011

U.S. Senate HELP Committee Staff Briefing
Washington, D.C.  November 2011

Annual Meeting of the Food, Drug and Cosmetic Section
New York State Bar Association
New York City, NY  January 2012

AdvaMed 510(k) Submissions Workshop
Las Vegas, NV  February 2012

MDMA's FDA Forum – PMA/510(k) Workshop & FDA Reform: 2012 and Beyond
Cupertino, CA  March 2012

Medcon 2012: FDA/Xavier University Medical Center Conference
Cincinnati, OH  May 2012

REVISION – 08-2014

16

Medical Device Quality Conference
Rockville, MD  May 2012

FDLI Medical Device Regulation and Litigation Conference
Washington, D.C.  June 2012

AdvaMed 2012: The MedTech Conference
Boston, MA  October 2012

AdvaMed 510(k) Submissions Workshop
Arlington, VA  October 2012

AdvaMed 510(k) Submissions Workshop
Arlington, VA  February 2013

FDLI Medical Device Regulation and Litigation Conference
Washington, D.C.  March 2013

MDMA's FDA Forum – PMA/510(k) Workshop
Palo Alto, CA  March 2013

FDLI 2013 Annual Conference
Washington, D.C.  April 2013

Medcon 2013: FDA/Xavier University Medical Center Conference
Cincinnati, OH  May 2013

Medical Device Quality Conference
Rockville, MD  June 2013

MD&M East
Philadelphia, PA  June 2013

Cook Medical 50th Anniversary Meeting
Las Vegas, NV  July 2013

AdvaMed 510(k) Submissions Workshop
Crystal City, VA  October 2013

AdvaMed 510(k) Submissions Workshop
Arlington, VA  February 2014

MDMA FDA Forum
Palo Alto, CA  March 2014

**REVISION – 08-2014**

Medcon 2014: FDA/Xavier University Medical Center Conference
Cincinnati, OH  May 2014

U.S. House of Representatives Medical Technology Caucus Briefing
Washington, D.C.  July 2014

## AWARDS

FDA Commissioner's Leveraging/Collaboration Award (June 2005) "For participation in
Counterterrorism and Emergency Preparedness activities at FDA."

FDA Commendation  (September 2004) "For extraordinary effort in assuring the
enactment of the Project Bioshield legislation."

FDA Group Recognition Award  (April 2004) "For outstanding initiative and teamwork
to expedite the many actions needed to successfully implement the Medical Device User
Fee and Modernization Act."

FDA Group Recognition Award  (April 2004) "For outstanding teamwork in the
successful development and implementation of the CDRH Emergency Preparedness
Plans."

FDA Commendation (November 2002) "For extraordinary efforts in developing the
Medical Device User Fee and Modernization Act of 2002."

DHHS Secretary's Award for Distinguished Service  (June 2001) "For outstanding
dedication, diplomacy, and diligence in developing the QuIC Errors Report: Doing What
Counts for Patient Safety."

FDA Award of Merit  (May 1999) "For dramatically increasing efficiency, bringing safe
and effective devices to market in an expedient manner, and maximizing the contribution
of Agency resources to public health and safety."

National Partnership for Reinventing Government "Hammer Award"  (January 1999)
"For contribution to building a government that works better and costs less."

FDA Award of Merit  (May 1998)  "For significant impact on the programs and personal
contributions to the quality of work performed by the Office of Device Evaluation."

FDA Group Recognition Award  (May 1998)  "For leading the Organizational
Transformation efforts within the Center for Devices and Radiological Health."

FDA Group Recognition Award  (May 1998)  "For exceptional commitment to the public
health while concluding a Mutual Recognition Agreement with the European Union."

CDRH Staff College Faculty of the Year Award  (March 1998)

REVISION – 08-2014

FDA Deputy Commissioner's Special Recognition Award  (June 1997)
"For outstanding contribution to the development of FDA's Good Guidance Practices, which set forth the Agency's procedures for developing, issuing, and using guidance documents."

CDRH Special Recognition Award (May 1997)  "For outstanding team work and exceptional performance in developing a process to recognize third-party reviewers in an effort to improve the Agency's review of premarket applications."

U.S. Department of Health and Human Services Secretary's Award for Distinguished Service (June 1996)  "For extraordinary accomplishments and outstanding teamwork in developing and implementing a policy for the expanded development and availability of new generation medical devices."

CDRH Reengineering Special Service Award  (August and October 1997)
"For extraordinary effort and coordination and planning for the development of an improved process as part of the Center for Devices and Radiological Health's Organizational Transformation efforts."

CDRH Special Recognition Award  (October 1996)  "In appreciation of the efforts leading to the Center's commemoration of the Twentieth Anniversary of the enactment of the Medical Device Amendments to the Federal Food, Drug and Cosmetic Act."

FDA Award of Merit  (May 1995)  "For sustained outstanding performance in providing significant contributions to the regulation of medical devices as a supervisor and spokesperson."

FDA Group Recognition Award  (May 1993)  "For outstanding performance in gathering and analyzing data used in the development of CDRH's Management Action Plan."

FDA Commendable Service Award  (January 1990)  "For evaluating and processing a backlog in intraocular lens premarket approval applications."

FDA Administration's Commendable Service Award  (June 1986)  "For outstanding resourcefulness in the development and implementation of an effective system to process and review IDE, PMA, and 510(k) submissions for ophthalmic laser devices."

FDA Commendable Service Award  (June 1984)  "For outstanding performance in evaluating the safety and effectiveness of intraocular lenses."

## CONTINUING EDUCATION

### Executive Level

Contemporary Executive Development
The George Washington University

Washington, DC 1989

Executive Leadership Development
U. S. Food and Drug Administration
Rockville, MD 1992-93

Issues in Science and Technology
The Brookings Institute
Charlottesville, VA 1994

**Others**

Equal Employment Opportunity (EEO)
McClure-Lundberg Associates
Rockville, MD 1982

Experimental Statistics
University of the District of Columbia
Silver Spring, MD 1982

Clinical Lasers
Washington, DC 1984

Lasers in Surgery
Laser Institute of America
Cincinnati, OH 1985

The Basic Food and Drug Law Course
Rockville, MD 1985

FDLI 31st. Annual Educational Congress
Washington, DC 1987

Regulation of Human Tissue and Organs
Washington, DC 1990

The Safe Medical Device Act of 1990
The Food and Drug Law Institute (FDLI)
Washington, DC 1990

34th. Annual FDLI Training Conference
Washington, DC 1990

Ethics Training
Rockville, MD 1992-2002

Health Industry Manufacturers Association (HIMA)

**REVISION – 08-2014**

Seminar on the GMP Regulation
Washington, DC 1994

EEO for Supervisors
College Park, MD 1994

# EXHIBIT B

<u>CASE DOCUMENTS CONSIDERED</u>

In addition to the publicly available documents cited in my report, I reviewed the following case materials:

Expert Report of Stan Myrum

Expert Report of Joseph J. Schwoebel and documents cited therein

Expert Report of David G. Benditt, M.D., FACC, FRCP(C), FHRS, FESC

Disclosure of Kenneth Stein

Complaint and Exhibits A-C, dated April 24, 2014

Boston Scientific Corporation's and Cardiac Pacemakers, Inc.'s Answer to Complaint and Counterclaims, dated June 16, 2014

March 10, 2015 Deposition of Doug Daum and Exhibits

March 13, 2015 Deposition of Kristen Harty and Exhibits

April 15, 2015 Deposition of Ching Zhu and Exhibits

April 16, 2015 Deposition of Julio Spinelli and Exhibits

BSC's Second Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories Nos. (1-4), dated January 5, 2015

BSC's Objections and Responses to Plaintiffs' Second Set of Interrogatories (Nos. 5-11), dated April 30, 2015

Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-9), dated September 29, 2014

Plaintiffs' Objections and Responses to BSC's Second Set of Interrogatories (Nos. 10-14), dated February 9, 2015

BSC00079700

AMI_00029027

## EXHIBIT C

PMA Database Printout for P030005/S123 for a "30-Day Notice"[29]

| | |
|---|---|
| New Search | Back to Search Results |

Note: this medical device record is a supplement. The device description may have changed. Be sure to look at the original PMA to get an up-to-date view of this device.

| | |
|---|---|
| **Trade Name** | CARDIAC RESYNCHRONIZATION THERAPY - PACEMAKER (CRT P) VALITUDE: U125 AND U128 |
| **Classification Name** | Pulse Generator, Pacemaker, Implantable, With Cardiac Resynchronization (Crt-P) |
| **Generic Name** | Cardiac Resynchronization Therapy Pacemaker (Crt-P) |
| **Applicant** | BOSTON SCIENTIFIC CORPORATION |
| **PMA Number** | P030005 |
| **Supplement Number** | S123 |
| **Date Received** | 05/08/2015 |
| **Decision Date** | 05/31/2015 |
| **Product Code** | NKE  [ Registered Establishments With NKE ] |
| **Advisory Committee** | Cardiovascular |
| **Supplement Type** | 30-Day Notice |
| **Supplement Reason** | Process Change: Manufacturing |
| **Expedited Review Granted?** | No |
| **Combination Product** | No |
| **Approval Order Statement** | |

Add an alternate source supplier for the anode battery raw material, stainless steel ribbon.

Page Last Updated: 07/01/2015

## EXHIBIT D

---

[29]  This represents a manufacturing change that was eligible for review as a 30-Day Notice by the Office of Compliance ("OC").  A 30-Day Notice is not a PMA supplement (21 CFR § 814.39(f)).

PMA Database Printout for P030005/S085 for a "135 Review Track For 30-Day Notice"[30]

| New Search | Back to Search Results |
|---|---|

Note: this medical device record is a supplement. The device description may have changed. Be sure to look at the underlined original PMA to get an up-to-date view of this device.

| | |
|---|---|
| **Trade Name** | INVIVE CARDIAC RESYNCHRONIZATION THERAPY-PACEMAKER |
| **Classification Name** | Pulse Generator, Pacemaker, Implantable, With Cardiac Resynchronization (Crt-P) |
| **Generic Name** | Cardiac Resynchronization Therapy Pacemaker (Crt-P) |
| **Applicant** | BOSTON SCIENTIFIC CORP. |
| **PMA Number** | P030005 |
| **Supplement Number** | S085 |
| **Date Received** | 07/06/2012 |
| **Decision Date** | 11/14/2012 |
| **Product Code** | NKE  [ Registered Establishments With NKE ] |
| **Advisory Committee** | Cardiovascular |
| **Supplement Type** | 135 Review Track For 30-Day Notice |
| **Supplement Reason** | Process Change: Manufacturing |
| **Expedited Review Granted?** | No |
| **Combination Product** | No |
| **Approval Order Statement** | |

Approval for the addition of an automated vision system during seal plug inspection.

Page Last Updated: 07/01/2015

---

[30] This represents a manufacturing change that was eligible for review as a 30-Day Notice that the Office of Compliance ("OC") could not complete in 30 days.  This constitutes a "135 Day Supplement".

**EXHIBIT E**

PMA Database Printout for P010012/S3419 for a "Normal 180 Day Track No User Fee"[31]

| | |
|---|---|
| New Search | Back to Search Results |

Note: this medical device record is a supplement. The device description may have changed. Be sure to look at the underline original PMA to get an up-to-date view of this device.

| | |
|---|---|
| **Trade Name** | ACUITY SPIRAL LEAD |
| **Classification Name** | Implantable Pulse Generator, Pacemaker (Non-Crt) |
| **Generic Name** | Cardiac Resynchronization Therapy-Defibrillator |
| **Applicant** | BOSTON SCIENTIFIC CORPORATION |
| **PMA Number** | P010012 |
| **Supplement Number** | S319 |
| **Date Received** | 01/09/2013 |
| **Decision Date** | 03/08/2013 |
| **Product Code** | LWP [ Registered Establishments With LWP ] |
| **Advisory Committee** | Cardiovascular |
| **Supplement Type** | Normal 180 Day Track No User Fee |
| **Supplement Reason** | Pas Protocal Supplement Osb |
| **Expedited Review Granted?** | No |
| **Combination Product** | No |
| **Approval Order Statement** Approval of the post-approval study protocol. | |

Page Last Updated: 07/01/2015

---

[31] This represents a request to change a Postapproval Study Protocol and not a change to the device. The request is reviewed by the Office of Surveillance and Biometrics ("OSB") in CDRH, not ODE.

**EXHIBIT F**

From: FDA Approval of Cardiac Implantable Electronic Devices via Original and Supplement Premarket Approval Pathways, 1979-2012
http://jama.jamanetwork.com/article.aspx?articleid=1817796

JAMA. 2014;311(4):385-391. doi:10.1001/jama.2013.284986



Figure Legend

Trends in Premarket Approval Supplements for Cardiac Implantable Electronic Devices, 1980-2012Mean number of premarket approval (PMA) supplements, by type, approved per active PMA each year from 1980-2012. The first supplement for a cardiac implantable electronic device was approved in 1981. The right-side axis (black line) displays the number of active PMAs, which increased steadily to 61 in 2012.